IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

JUAN M. RODRÍGUEZ-RIVERA.,

**Plaintiff,**

v.

ALLSCRIPTS HEALTHCARE SOLUTIONS,
INC., *et al.*,

**Defendants.**

CIVIL NO. 18-1076 (JAG)

OPINION AND ORDER

GARCIA-GREGORY, D.J.

The present action arises from the destruction of the Electronic Health Records ("EHRs") of Dr. Juan M. Rodríguez-Rivera's ("Plaintiff") patients, which were stored on Allscripts Healthcare, LLC's ("Allscripts") server.[1] The case was dismissed by this Court for lack of personal jurisdiction and failure to state a claim. Docket Nos. 189; 190. Plaintiff subsequently appealed. Docket No. 207. The United States Court of Appeals for the First Circuit vacated the decision as it pertained to Allscripts and remanded "for further proceedings." *Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 158, 172 (1st Cir. 2022); *see also* Docket No. 214 at 3, 38. The First Circuit specifically instructed this Court to proceed to trial to determine whether (1) a contract containing an arbitration clause existed, and (2) whether Plaintiff signed such a contract. Docket No. 214 at 35.

---

[1] Allscripts changed its name to Veradigm in 2023. Docket No. 324 at 54, ¶¶ 6-7. For clarity, the Court will refer to Veradigm as Allscripts throughout this Opinion and Order.

CIVIL NO. 18-1076 (JAG)                                                                2

## PROCEDURAL BACKGROUND

In 2009, Plaintiff, a rheumatologist, contracted with NovatekPR ("Novatek"), a third-party re-seller of Allscripts' MyWay product, to manage and store his patients' EHRs in accordance with his legal obligations under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"). Docket No. 214 at 4. "Allscripts is a North Carolina limited liability company with its principal place of business in Chicago . . . Allscripts' MyWay product is an EHR- and practice-management software designed to help physicians' practices. Allscripts' MyWay EHRs are stored on a server owned by Allscripts." *Id.* Plaintiff's EHRs were successfully stored on Allscripts' servers "uneventfully for several years." *Id.*

In September 2016, Allscripts informed Plaintiff that it would discontinue its support for the MyWay system at the end of October 2017 and would migrate the EHRs to its new system, Professional EHR. Docket No. 214 at 5. Plaintiff elected to transfer the EHRs to Aprima, a competitor of Allscripts, rather than transitioning to Allscripts' new system. *Id.* When Aprima contacted Allscripts in February 2017 regarding the migration of Plaintiff's EHRs, Allscripts informed Aprima that it was unable to locate the records. *Id.* Plaintiff later received the following email:

> Allscripts no longer has your patient data. It was destroyed because we no longer had an existing [Business Associates Agreement] with your practice. Your practice was a subaccount of Novatek, a MyWay partner. . . . The Novatek account was sent to collections in 2014 and for whom maintenance was terminated.

CIVIL NO. 18-1076 (JAG)                                                                          3

*Id.* As a result, Plaintiff initiated this action against Allscripts and Allscripts Healthcare Solutions, Inc.[2] ("Allscripts Healthcare") for breach of contract, negligence, *dolo*, fraud, mail and wire fraud, breach of implied warranty, unjust enrichment, and temerity.[3] Docket No. 49. As the Parties were unable to produce the contract between Plaintiff and Novatek, Allscripts deposed Luis Carmoega ("Carmoega"), the owner of Novatek. Docket Nos. 189 at 2-4, 7; 214 at 6. Carmoega testified that Plaintiff "must have" signed an End User License Agreement ("EULA") that mirrored the EULA that was introduced into evidence and contained an arbitration clause. Docket No. 214 at 7.

Co-Defendant Allscripts Healthcare moved to dismiss the Complaint for lack of personal jurisdiction and to compel arbitration, claiming that Plaintiff had signed a EULA containing an arbitration clause. Docket No. 163. In contrast, Plaintiff contended that "[t]here is no existing contract signed by [him] containing an arbitration clause" and he did not consent to arbitration. Docket No. 169 at 14. The Court granted the Motion to Dismiss, holding that

> Dr. Rodríguez agreed to arbitrate this matter by signing the EULA, which governs the use of the MyWay product and consequently, binds the user to its terms which include a clause of mandatory [ ] arbitration, stating "that any dispute or claim, arising out of, or in connection with this Agreement shall be finally settled by binding arbitration in Raleigh, North Carolina."

Docket No. 189 at 7-8. Plaintiff appealed. Docket No. 207.

On July 19, 2022, the First Circuit affirmed the dismissal of Allscripts Healthcare "on personal-jurisdiction grounds but vacate[d] and remand[ed] for further proceedings as to Allscripts." Docket No. 214 at 3. Specifically, the First Circuit noted that the Court abused its

---

[2] Allscripts Healthcare—a Delaware holding company with its principal place of business in Chicago—indirectly owns Allscripts. Docket No. 214 at 4.

[3] Plaintiff voluntarily dismissed his claims against Healthcare Data Solutions, LLC and HDSOSF, LLC. *See* Docket No. 136.

CIVIL NO. 18-1076 (JAG)                                                                          4

discretion in striking Plaintiff's affidavit, where he denied signing the EULA. *Id.* at 31-32. Thus, "whether a contract containing an arbitration clause and signed by [Plaintiff] exists was a disputed factual matter and the district court thus should have 'proceeded summarily to trial to resolve the question.'" *Id.* at 35 (citing *Air-Con, Inc. v. Daikin Applied Latin Am., LLC,* 21 F.4th 168, 175 (1st Cir. 2021)).

The First Circuit noted that Carmoega's testimony alone was not sufficient to find that Plaintiff consented to arbitration because "the record contain[ed] no evidence . . . about whether the EULA he saw at [the] deposition contained the same terms as the one he would've shown [Plaintiff] in 2009," and "Carmoega testified at other points that he could not recall the details of the various agreements." Docket No. 214 at 34. Furthermore, the First Circuit underscored that "Allscripts failed to present any record evidence to meet its burden of showing that the EULA that [Plaintiff] 'must have' signed contained any arbitration agreement. There was no testimony, nor any documentary evidence, that Allscripts used the same EULA in 2009 (when Rodríguez allegedly would have signed it) as it did in 2008 (when the version presented to the district court was signed)." *Id.* Therefore, the First Circuit instructed this Court to summarily conduct a trial to determine "whether a [1] contract containing an arbitration clause and [2] signed by Rodríguez exists." *Id.* at 35 (citing *Air-Con, Inc.,* 21 F.4th at 175). In accordance with the First Circuit's guidance and Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, a non-jury trial was held on May 28, 2024.[4] Docket No. 305.

---

[4] The Court denied as untimely Plaintiff's request for a jury trial regarding the existence of an arbitration agreement. Docket No. 246.

CIVIL NO. 18-1076 (JAG)                                                                                        5

## STANDARD OF REVIEW

Section 4 of the FAA provides that, when the formation of an arbitration agreement is at issue, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. The First Circuit has not prescribed specific procedures for such a trial and has left "the conduct of [Section] 4 trials to the discretion of the district court." *Air-Con, Inc.*, 21 F.4th at 175 (citation omitted). The district court is to resolve any factual disputes "before it can be determined whether the parties agreed to arbitrate." *Id.* at 176 (citations omitted). A trial court's findings of facts are given considerable deference due to "the trial court's superior ability to judge credibility." *Blue Cross & Blue Shield v. AstraZeneca Pharms. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156, 163 (1st Cir. 2009).

> This deference comports with common sense: a judge, sitting jury-waived, has the opportunity to see and hear the witnesses at first hand and to immerse himself in the nuances of the proof. Consequently, the appellate process ought to respect the trial judge's superior "feel" for the case and his enhanced ability to weigh and evaluate conflicting evidence.

*United States v. 15 Bosworth St.*, 236 F.3d 50, 53 (1st Cir. 2001). Credibility determinations are "grist for the trial court's mill." *Paraflon Invs., Ltd. v. Fullbridge, Inc.*, 960 F.3d 17, 33 (1st Cir. 2020).

## FINDINGS OF FACT

At the outset, the Court must evaluate conflicting testimony and the witnesses' credibility. After examining all the testimony and evidence in this case, the Court finds that Angela Whiteside Smith ("Smith"), an attorney employed by Allscripts, provided credible testimony, which was consistent with Carmoega's deposition testimony. On the other hand, the Court does not find Plaintiff's testimony to be credible.

CIVIL NO. 18-1076 (JAG)                                                                                 6

Plaintiff's credibility was first brought into question when he refused to authenticate his signature and initials in a faithful copy of a declaration filed under penalty of perjury that his attorneys submitted to the Court. *See* Docket No. 324 at 142-48; *see also* Docket No. 156-1. Instead, Plaintiff requested that the original copy be produced to tell "with certainty whether it [was his] signature or not," even though the electronic copy was clear and legible. Docket No. 324 at 140, 142-43. During trial, the Court noted that (1) the exhibit was a faithful copy of Plaintiff's declaration under penalty of perjury, which he himself filed with the Court, and (2) the Court could take judicial notice of the document as such. Docket No. 324 at 141, 143. Furthermore, Fed. R. of Evid. 1003 permits the admission of duplicates unless there is a genuine question raised as to the original's authenticity. Plaintiff did not challenge the original document's authenticity and Plaintiff's own counsel stipulated that it was in fact his signature. *Id*. at 143, ¶¶ 13-15. Even after his attorneys stipulated in open court that Plaintiff signed the document, Plaintiff continued testifying that he could not "tell [the Court] with certainty" that the signature was his "since it's a copy." *Id*. at 143, ¶¶ 23-25. Plaintiff additionally questioned the validity of a Business Association Agreement he himself produced—and presented to the Court under penalty of perjury—as an original document in his possession. *Id*. at 145, 147, 150; *see also* Docket No. 156-1. Plaintiff went so far as to imply the signature on the Business Association Agreement he produced was a forgery. Docket No. 324 at 147, ¶¶ 1-2. Plaintiff's in-court statements, which directly conflicted with his own declaration under penalty of perjury, was a fatal blow to his credibility.

Plaintiff made additional statements that further undermined his credibility. He conceded that he did sign a document with Novatek to access the MyWay system. Docket No. 324 at 152, ¶¶ 4-12. He also asserted that he did not know that the use of the MyWay system was subject to *any* terms and conditions. *Id*.. Plaintiff also claimed to be unaware that terms and conditions apply

CIVIL NO. 18-1076 (JAG)                                                                                7

to the use of software systems, such as Google or the iPhone, despite his use of the technology "since it came out."[5] *Id.* at 152, 154. Moreover, Plaintiff implied, without any evidence in support, that an email sent by Carmoega contained various documents where Plaintiff's signature was forged[6] and that this message was sent to an email under Plaintiff's name that was not under Plaintiff's control.[7] *Id.* at 147-48. Thus, considering Plaintiff's repeated refusals to authenticate his signature on documents he himself presented to the Court and relied upon in support of his case, and considering that his in-court statements conflicted with his own declaration filed under penalty of perjury, the Court gives little weight to Plaintiff's testimony.

The Court makes the following findings of fact:

---

[5] The Court takes judicial notice that software has been widely subject to terms and conditions through the use of EULA's since the late 1990s. *See* Robert W. Gomulkiewicz & Mary L. Williamson, *A Brief Defense of Mass Market Software License Agreements*, 22 Rutgers Computer & Tech. L.J. 335, 336-37 (1996) ("In the rapidly changing world of personal computer software, the [EULA] has endured. The EULA is a familiar component of most personal computer software transactions. . . . Despite the din of criticism, EULAs continue to be widely used by almost every mass-market software publisher, even though the cost of doing so is significant."). The Court is skeptical that anyone who regularly engages with technology, particularly an iPhone, which was first released in 2007, would be unaware that terms and conditions apply to the use of most software. *See* Docket No. 324 at 152, ¶¶ 17-19; *see also* Anthony Karcz, *10 Years With the iPhone: How Apple Changed Modern Society* (Forbes 2017), https://www.forbes.com/sites/anthonykarcz/2017/01/09/apple-iphone-10-year-anniversary/.

[6] Plaintiff presented no evidence or expert testimony to support this claim.

[7] The email in question, Docket No. 306-6 (Exhibit DTX008), was directed to a "Juan Rodríguez" but the document did not show an email address in full. The Court notes that the full email address of a recipient may be omitted in lieu of a user's display name when an email is printed. *See* MICROSOFT ANSWERS, *Display Full Email Address for Recipients on Printed Emails* (2022), https://answers.microsoft.com/en-us/outlook_com/forum/all/display-full-email-address-for-recipients-on/d1e9104f-0cb6-4158-b838-3c56ea4dbbbb ("Outlook does not display the email address when printing, however I noticed that when mail is received from an external email address Outlook does show the email address alongside the display name, I tested this with an external email address. However[,] for email addresses that are from the same organization Outlook does not display any email address, but only the name.").

CIVIL NO. 18-1076 (JAG)                                                                          8

1.  MyWay is an entry-level EHR system that provides access to patient records in an electronic format and was intended to serve small medical offices composed of one or two doctors. Docket No. 324 at 57, ¶¶ 10-22.

2.  MyWay was previously licensed by Misys, a company that merged with Allscripts in 2008. *Id.* at 57, 80.

3.  Allscripts acquired Misys' Master Agreement, which "govern[ed] how [it] license[d] [the MyWay] solution upon the merger." *Id.* at 58, 80; *see also* Docket No. 306-8 (Exhibit DTX010).

4.  The Misys' Master Agreement, which predated the 2008 merger, contained the following arbitration clause:

    > Any dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by binding arbitration in Raleigh, North Carolina, in accordance with the then-current rule and procedures of the American Arbitration Association by three (3) arbitrators appointed by the American Arbitration Association. The arbitrators shall apply the law of the State of North Carolina, without reference to rules of conflict of law or statutory rules of arbitration, to the merits of any dispute or claim. Judgment on the award rendered by the arbitrators may be entered in any court of competent jurisdiction. The parties specifically waive and disclaim the applicability of the Uniform Commercial Code, Uniform Electronic Transactions Act, and Uniform Computer Information Transaction Act to this Agreement, In the event any action or proceeding is brought in connection with this Agreement, each party shall be responsible for its costs and reasonable attorney's fees. Except for Client and Misys, no other party may sue or be sued under this Agreement.

    Docket No. 306-8 at 3, ¶ 11.9 (Exhibit DTX010); *see also* Docket No. 324 at 83, ¶ 8.

5.  After the Misys merger, in October 2008, Allscripts employed their own EULA—the 2008 EULA—for the licensing of the MyWay system. Docket No. 324 at 86, ¶¶ 1-6, 19-25; *see also* Docket No. 306-9 (Exhibit DTX011).

CIVIL NO. 18-1076 (JAG)                                                                                    9

6.  As a routine business practice, Allscripts includes arbitration clauses in "every form" of contract it employs. Docket No. 324 at 71, 78, 131.

7.  Allscripts sold the MyWay system through a licensing model, whereby the "client would receive a license directly from Allscripts," or through a subscription model purchased through a third-party reseller. *Id.* at 59.

8.  Clients who purchased MyWay's subscription model were assigned business client numbers that correlated to the third-party seller from whom they purchased the software. *Id.* at 40-41.

9.  Purchase of the MyWay system through a third-party reseller is subject to Allscripts' Partner Agreement Software License Terms, Partner Agreement (the "Partnership Agreement"), and MyWay EULA. *Id.* at 58-59; *see also* Docket No. 306-1 (Exhibit DTX003).

10. The Partnership Agreement refers to third-party resellers as "Partners," and defined End Users as "Partner's clients to which Partner will be reselling or promoting Allscripts'[] Products and/or Services and which are registered through Allscripts['] Partner Portal." Docket Nos. 306-1 at 12 (Exhibit DTX003); 306-3 at 2 (Exhibit DTX005); *see also* Docket No. 324 at 65-66.

11. The Partnership Agreement contains the following arbitration clause:

> In case of any and all disputes in connection with the negotiation, execution, interpretation, performance or non-performance of this Agreement, Parties agree to seek non-binding mediation, which shall be conducted in Raleigh, North Carolina by a single mediator selected by the Parties. The mediator shall conduct the proceedings pursuant to the rules of the American Arbitration Association, as now or hereafter amended. In the event that any such mediation does not produce a settlement, unless the dispute is otherwise settled, the dispute shall be determined by binding and final arbitration in Raleigh, North Carolina, by three (3) arbitrators selected by the Parties (or by the American Arbitration Association

> if the Parties cannot agree) in accordance with the law of the state
> of North Carolina and the rules of the American Arbitration
> Association.

Docket No. 306-3 at 6-7(Exhibit DTX005).

12. Partners are instructed to utilize a specific package of contracts with End Users. Docket Nos. 306-1 (Exhibit DTX003); 324 at 64, 90.

13. Allscripts relies on Partner resellers to provide its contract package to the End User. Docket No. 324 at 90, 113-15.

14. Partners were obligated to secure the End User's signature on the contracting documents provided by Allscripts; failure to do so would constitute a breach of contract. *Id.* at 103, ¶¶ 1-15.

15. As part of Allscripts' regular course of business, the EULA is included in the contracting documents provided to Partner resellers for the licensing of the MyWay system to its subscribers. *Id.* at 87, 103.

16. Allscripts' 2008 EULA outlines the terms and conditions that apply to the use of the software, as well as the licensing rights and restrictions on the license. *Id.* at 76, ¶¶ 21-25.

17. A EULA is an agreement between Allscripts and the End User. *Id.* at 88, ¶¶ 5-6.

18. The 2008 EULA specified that

> [The Agreement] is entered into between you, the Client ("Client") and Allscripts, LLC ("Allscripts"). The terms of this Agreement are in addition to the provisions of the master agreement entered into between Allscripts authorized partner ("Partner") and you, the Client, which incorporates this Agreement by reference. Allscripts will license the Software only if you accept the terms of this Agreement. By using the Software you agree to these terms. If you do not agree to the terms of the Exhibit, promptly return or uninstall the unused Software to the Partner from whom you acquired it to receive a refund of the amount you paid.

CIVIL NO. 18-1076 (JAG)                                                                11

Docket No. 306-9 at 1 (Exhibit DTX011).

19.  The 2008 EULA also contained the following arbitration clause:

> Any dispute or claim arising out of, or in connection with, this
> Agreement shall be finally settled by binding arbitration in Raleigh,
> North Carolina, in accordance with the then-current rules and
> procedures of the American Arbitration Association by three (3)
> arbitrators appointed by the American Arbitration Association. The
> arbitrators shall apply the law of the State of North Carolina,
> without reference to rules of conflict of law or statutory rules of
> arbitration to the merits of any dispute or claim. Judgment on the
> award rendered by the arbitrators may be entered in any court of
> competent jurisdiction. The parties specifically waive and disclaim
> the applicability of the Uniform Commercial Code, Uniform
> Electronic Transactions Act, and Uniform Computer Information
> Transactions Act to this Agreement. In the event any action or
> proceeding is brought in connection with this Agreement each
> party shall be responsible for its costs and reasonable attorneys'
> fees. Except for Client and Allscripts, no other party may sue or be
> sued under this Agreement.

*Id.* at 3 (Exhibit DTX011).

20.  The 2009 version of the Allscripts' Master Agreement referred to in the EULA included

the following arbitration clause:

> Any dispute or claim arising out of, or in connection with, this
> Agreement shall be finally settled by binding arbitration in Raleigh,
> North Carolina, in accordance with the then-current rules and
> procedures of the American Arbitration Association by one (1)
> arbitrator appointed by the American Arbitration Association. The
> arbitrators shall apply the law of the State of North Carolina,
> without reference to rules of conflict of law or statutory rules of
> arbitration, to the merits of any dispute or claim. Judgment on the
> award rendered by the arbitration may be entered in any court of
> competent jurisdiction. In the event any action or proceeding is
> brought in connection with this Agreement, each party shall be
> responsible for its own costs and attorneys' fees. Except for Client
> and Allscripts, no other party may sue or be sued under this
> Agreement.

CIVIL NO. 18-1076 (JAG)                                                                  12

Docket No. 306-6 at 8 (Exhibit DTX008).[8]

21. It was Allscripts' routine business practice to require an End User to sign the EULA prior to obtaining access to the MyWay system. Per Allscripts' policy, an End User cannot use the MyWay system without accepting the terms of the EULA. Docket No. 324 at 88, ¶¶ 7-9.

22. Allscripts does not directly communicate with End Users about the EULA. *Id.* at 113-14.

23. A Partner reseller who grants access to the MyWay system to a client that has not signed the contracting documents provided by Allscripts, including the EULA, would be in breach of contract. *Id.* at 103, ¶¶ 9-15.

24. End Users may contact Allscripts directly for assistance through its customer support line. *Id.* at 123-24.

25. Novatek entered into a Partnership Agreement with Allscripts on December 30, 2008, to become a third-party reseller of Allscripts' products and services. Docket No. 306-1 at 11 (Exhibit DTX003).

26. On December 31, 2008, Novatek entered into a New Reseller Contract under the business client number 1700133. Docket No. 306-5 (Exhibit DTX007).

27. Clients who purchased the MyWay subscription model from Novatek would be identified under Novatek's 1700133 number, followed by a letter identifying the End User. Docket No. 324 at 40-41.

---

[8] While the arbitration clauses differ slightly as to the structure of the arbitration proceedings, the clauses are substantively identical in nature. And for purposes of this Court's analysis, the minor distinctions do not alter the Court's analysis.

28. Novatek only sold MyWay on behalf of Allscripts and did not sell any other of Allscripts' EHR systems. *Id.* at 18-19.

29. Novatek complied with the terms of the Partnership Agreement. *Id.* at 32, ¶¶ 8-17.

30. It was standard practice for Novatek to ensure that its clients agreed to the EULA. *Id.* at 35, ¶¶ 23-25.

31. Plaintiff attempted to purchase MyWay through its leasing system in June 2009 but was unable to secure funding to proceed. *Id.* at 38; *see also* Docket No. 306-6 (Exhibit DTX008).

32. In his attempt to purchase MyWay through the leasing system, Plaintiff filled out forms with Novatek to be submitted with the financing company Leaf Financial. Docket No. 324 at 38-39; *see also* Docket No. 306-6 (Exhibit DTX008).

33. Plaintiff additionally signed a Client Order Form and initialed a Master Agreement on June 4, 2009. Docket No. 306-6 at 3-11 (Exhibit DTX008).

34. The 2009 Master Agreement signed by Plaintiff contained the following arbitration clause:

> Any dispute or claim arising out of, or in connection with, the Agreement shall be finally settled by binding arbitration in Raleigh, North Carolina, in accordance with the then-current rules and procedures of the American Arbitration Association by one (1) arbitrator appointed by the American Arbitration Association. The arbitrator shall apply the law of the State of North Carolina, without reference to rules of conflict of law or statutory rules of arbitration, to the merits of any dispute or claim. Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction. In the event any action or proceeding is brought in connection with this Agreement, each party shall be responsible for its own costs and attorneys' fees. Except for Client and Allscripts, no other party may sue or be sued under this Agreement.

*Id.* at 8 (Exhibit DTX008).

35. On June 5, 2009, Carmoega emailed Plaintiff the signed and initialed copy of the Allscripts Master Agreement for the MyWay direct licensing model. *Id.* at 1.

36. After Plaintiff was unable to secure funding for the licensing model, he proceeded to purchase MyWay's subscription model. Docket No. 324 at 38-39, 41.

37. Plaintiff purchased Allscripts' MyWay subscription system through Novatek in October 2009. Docket No. 324 at 41, 133; *see also* Docket No. 306-5 at 2 (Exhibit DTX007).

38. Plaintiff was Novatek's first client to purchase the MyWay subscription model. Docket No. 324 at 165-66.

39. Plaintiff received the business identification number 1700133A, which grouped him under Novatek's client number. Docket No. 306-5 at 2 (Exhibit DTX007).

40. Plaintiff signed a Business Associate Agreement with Novatek, as required by HIPAA, which authorized access to and ensured protection of patient data. Docket No. 324 at 24.

41. The Business Associate Agreement did not specifically refer to MyWay. *Id.* at 172; *see also* Docket No. 156-1.

42. In addition to the Business Associate Agreement, Plaintiff signed a document with Novatek that granted him access to the MyWay system. Docket No. 324 at 152.

43. The Business Associate Agreement contained a typographical error referring to Prime Clinical System, Inc. as the Partner, instead of Novatek. *Id.* at 179, 182.

44. Plaintiff contacted Allscripts' customer support line in July 2016. *Id.* at 123.

45. Plaintiff used the MyWay system. *Id.* at 124, 129.

46. Carmoega lost his electronic copies of Novatek's contracts when his computer crashed, and the data stored on the hard drive was lost. Docket No. 324 at 41, 160.

47. Novatek's physical copies of the contracts were destroyed during the passage of Hurricane Maria over Puerto Rico on September 16, 2017. *Id.* at 41.

## LEGAL ANALYSIS

"A party seeking to compel arbitration under the FAA must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" *Biller v. S-H OpCo Greenwich Bay Manor, LLC*, 961 F.3d 502, 508 (1st Cir. 2020) (citing *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011)). Whether a valid agreement to arbitrate exists is to be determined in accordance with Puerto Rico contract law. *See Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 207 (1st Cir. 2019).

### A. Existence of Valid Arbitration Clause

There is scarce guidance from the Puerto Rico Supreme Court ("PRSC") as to the burden of proof required to prove the terms of a missing or lost contract.[9] Nevertheless, in the context of

---

[9] With oral contracts, the PRSC has required clear and convincing evidence to enforce the parties' agreement. *See González Rivera v. Robles Laracuente*, 203 P.R. Dec. 645, 661 (2019) ("To prove the existence of an express verbal agreement, it must be shown through unquestioned and unequivocal manifestation of the parties.") (Translation provided by the Translations Department of the Supreme Court of Puerto Rico of the original Spanish Language text "*para establecer un pacto verbal expreso es menester evidenciar la manifestación indubitada e inequívoca de las partes.*"). Other Circuits have made similar determinations. *See Glass v. Kirkland*, 29 F.3d 1266, 1268 (8th Cir. 1994) ("A party seeking enforcement of an oral contract must prove the existence and terms of the contract by clear and convincing evidence."); *Smith Trucking, Inc. v. Cotton Belt Ins. Co.*, 556 F.2d 1297, 1304 (5th Cir. 1977) ("Oral contracts of insurance must be established by clear and convincing evidence, full and clear proof, etc., and [that] it must be shown that each party understood its terms in the same light.") (cleaned up); *see also United States v. One Parcel of Real Prop.*, CA No. 90-35334, 1991 U.S. App. LEXIS 693, at *5-6 (9th Cir. Jan. 16, 1991) ("But Oregon courts are reluctant to enforce an oral contract for land in the absence of clear and convincing evidence of the existence of the contract, and the party arguing for performance of the oral contract must provide evidence that the contract was definite, certain and reasonable in its terms.") (cleaned up).

CIVIL NO. 18-1076 (JAG)                                                                          16

insurance policies, for example, this Court has found that the terms and conditions of a missing

policy must be proven through clear and convincing or, at a minimum, strong conclusive evidence.

*Metlife Capital Corp. v. Westchester Fire Ins. Co.*, 224 F. Supp. 2d 374, 384 (D.P.R. 2002) ("[T]he

proponent of the missing policy bears the heavy burden of establishing the existence as well as

the terms and conditions of the policy by clear and convincing, or at least, strong and conclusive

evidence."). In *Metlife*, the defendant's position relied on the terms of a missing insurance policy.

*Id.* The Court found that

> To indirectly prove the contents of a lost policy, a party can present
> secondary evidence as probative of coverage. Such secondary
> evidence may include testimony by [ ] witnesses having familiarity
> with the terms of the original document. Documentary proof is also
> helpful and can include correspondence, financial statements,
> annual reports, certificates of insurance, and records of premium
> payments.

*Id.* (cleaned up). The First Circuit similarly noted that "secondary evidence or business-routine

evidence may sometimes be used to prove the agreement when the original is missing." Docket

No. 214 at 33 (citing *Paul Revere Variable Annuity Ins. Co. v. Zang*, 248 F.3d 1, 9 (1st Cir. 2001); Fed. R.

Evid. 406 and 1004). The Court, however, cautioned that "mere surmise, conjecture, or

speculation about the contents of a policy will also not be sufficient, particularly when the lost

writing is central to the 'very foundation of the claim.'" *Id.* (citing *Sylvania Elec. Prods., Inc. v. Flanagan*,

352 F.2d 1005, 1008 (1st Cir. 1965)).

　　　　In the present case, the Court finds that Allscripts has demonstrated the following:

(1) All of Allscripts' contracts contained arbitration clauses, which are substantively identical

　　　in nature.

(2) The contracts relating to the MyWay system, including those which predate the 2008

　　　merger, all contained substantively similar arbitration clauses.

(3) All End Users were obligated to sign contracting documents containing arbitration clauses.

(4) Novatek was a third-party reseller of Allscripts' MyWay system.

(5) Novatek was contractually bound to ensure End Users of the MyWay system signed Allscripts' contracting documents, all of which contained arbitration clauses.

(6) Third-party resellers who failed to acquire signed consent to MyWay's EULA would be in breach of contract.

(7) Plaintiff unsuccessfully attempted to purchase MyWay's licensing model through Novatek in June 2009.

(8) As part of his attempt to purchase MyWay's licensing model, Plaintiff signed various contracts containing arbitration clauses.

(9) After Plaintiff was unable to purchase the license model, Plaintiff purchased MyWay's subscription model through Novatek in October 2009.

(10) As part of Plaintiff's purchase of MyWay's subscription model, he signed contracts that contained arbitration clauses.

(11) Novatek did not breach its contractual obligations with Allscripts when it granted Plaintiff access to the MyWay subscription model.

(12) Plaintiff agreed to arbitration.

The Court finds that Allscripts has met its burden of showing that "a valid agreement to arbitrate exists, [it] is entitled to invoke the arbitration clause, [and Plaintiff] is bound by that clause." *Biller*, 961 F.3d at 508. On the other hand, Plaintiff has presented no credible evidence to the contrary.

CIVIL NO. 18-1076 (JAG)                                                                        18

The First Circuit held that Carmoega's testimony alone was not sufficient to find that Plaintiff consented to arbitration because "the record contain[ed] no evidence . . . about whether the EULA he saw at [the] deposition contained the same terms as the one he would've shown [Plaintiff] in 2009" and "[t]here was no testimony, nor any documentary evidence, that Allscripts used the same EULA in 2009 (when Rodríguez allegedly would have signed it) as it did in 2008 (when the version presented to the district court was signed)." Docket No. 214 at 34-35. Through new evidence presented at trial, Allscripts has successfully addressed the First Circuit's concerns by presenting additional evidence to show that a contract signed by Plaintiff contained an arbitration clause and, thus, that Plaintiff is bound by the agreement to arbitrate. Specifically, Smith testified that the MyWay system could not be accessed without prior agreement to the EULA and that Allscripts includes arbitration clauses in all its contracts as a routine business practice. She also presented various contracting documents—each containing substantively similar arbitration agreements—dated prior to and after Plaintiff's purchase of the MyWay system, from which it can be reasonably inferred that the agreement signed by Plaintiff contained a substantially similar arbitration clause. Allscripts also presented new evidence showing that Plaintiff was put on notice as to Allscripts' arbitration clauses, notably through the contracting documents signed by Plaintiff during his attempt to purchase MyWay's licensing model mere months prior to his final purchase of the subscription model. Allscripts additionally proffered new evidence that Novatek complied with Allscripts' business practices and its contractual obligations during Plaintiff's attempts to purchase the MyWay system, obligations which included securing Plaintiff's signed consent to the MyWay EULA. In light of the new evidence presented by Allscripts, the Court finds that this evidence is sufficient to conclude that Plaintiff agreed to arbitration.

CIVIL NO. 18-1076 (JAG)                                                                 19

Thus, the Court turns to whether Plaintiff's claim falls squarely within the scope of Allscripts' arbitration clause.

### B.  Scope of the Arbitration Clause

After finding that the movant is entitled to invoke the arbitration clause and that the non-movant is bound by that clause, a court must evaluate whether the claims fall within the scope of the arbitration clause. *Biller*, 961 F.3d at 508. "In evaluating the scope of the arbitration clauses, we are mindful that all doubts are resolved in favor of arbitration; arbitration will be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 450 (1st Cir. 2010) (cleaned up). "Ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration. This presumption in favor of arbitration applies unless the party opposing arbitration rebuts it." *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014) (citation omitted).

Allscripts has proven that each of its contracting documents contain a substantially similar arbitration clause, which is broad in scope. *See* Docket Nos. 306-1 at 16 (Exhibit DTX003) ("[A]ny and all disputes in connection with the negotiation, execution, interpretation, performance or non-performance of this Agreement, Parties agree to seek non-binding mediation, which shall be conducted in Raleigh, North Carolina . . . ."); 306-3 at 6-7 (Exhibit DTX005) ("[A]ny and all disputes in connection with the negotiation, execution, interpretation, performance or non-performance of this Agreement, Parties agree to seek non-binding mediation, which shall be conducted in Raleigh, North Carolina . . . ."); 306-4 at 4 (Exhibit DTX006) ("Any dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by

binding arbitration in Raleigh, North Carolina . . . ."); 306-6 at 8 (Exhibit DTX008) ("Any dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by binding arbitration in Raleigh, North Carolina . . . ."); 306-7 at 8 (Exhibit DTX009) ("Any dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by binding arbitration in Raleigh, North Carolina . . . ."); 306-8 at 3 (Exhibit DTX010) ("Any dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by binding arbitration in Raleigh, North Carolina . . . ."); and 306-9 at 3 (Exhibit DTX011) ("Any dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by binding arbitration in Raleigh, North Carolina . . . ."). While circuit courts have found "the phrase 'arising under' is narrower in scope than the phrase 'arising out of or relating to,'" *Dialysis Access Ctr., LLC*, 638 F.3d at 380 (citation omitted), Allscripts' "arising out of" or "in connection with" language mirrors the broad and favored "relating to" wording that is "the standard language recommended by the American Arbitration Association." *Id.* Furthermore, Plaintiff's claim that Allscripts breached its contractual obligations through the destruction of the EHRs falls squarely within the sufficiently broad arbitration clauses found in all of Allscripts' contracting documents. *Id.*

Accordingly, Allscripts has established that Plaintiff agreed to arbitration and that this case falls within the scope of the arbitration clause.

## CONCLUSION

For the aforementioned reasons, the Court finds that (1) a contract containing an arbitration clause existed, (2) Plaintiff signed the contract, (3) Defendant is entitled to invoke the clause, and (4) Plaintiff's claims fall squarely within the scope of the arbitration clause.

**CIVIL NO.** 18-1076 (JAG)                                                                    21

Accordingly, the case is hereby **DISMISSED WITHOUT PREJUDICE** and the Parties are compelled to proceed to arbitration. Judgment shall be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this Friday, January 10, 2025.

s/ Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge